I may have mispronounced your client's name, but I'm sure you'll correct me. Natan. Natan. Your Honor. You touched on this. Thank you. Good morning, Your Honors. And may it please the Court, I am Robert G. Ryan for the petitioner Agnes Natan, who         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I'd like to reserve two minutes for rebuttal. The petitioner is a single, 57-year-old Indonesian citizen. She is ethnic Chinese and Catholic. She claims to have protected grounds of ethnicity, religion, imputed political opinion, and membership in a particular social group, that is, Indonesia's ethnic Chinese Christian women. And under Selvi Ashcroft, the record shows that she is also a member of the significantly disfavored group of Indonesia's ethnic Chinese minority. At the outset, we note that the subjective component here for asylum is satisfied, because the immigration judge found that Ms. Natan was a credible witness. In brief, this case is easily distinguishable from the en banc panel's decision in LaLange, because credible, direct, and specific evidence exists that native Indonesians targeted Ms. Natan based on her Chinese ethnicity. In other words, she has stated a strong claim that she faces an individualized risk of persecution in Indonesia. And what do you mean by individualized, counsel? Well, Your Honor, I was going to go into the particulars of the case just now. She testified on May 13, 1998, during the riots in Jakarta, as she was trying to drive home with two co-workers, one native Indonesian and the other an ethnic Chinese co-worker, that her car got caught in a mob, as many native Indonesians banged for about 10 minutes very hard on her car windows and shouted, Chinese, Chinese, and demanded money. Is there any evidence that they had specifically selected Ms. Natan for that treatment? There's no specific evidence, Your Honor, that they chose her, but it's similar to what happened in the sale during the same riots, when her cart was approached and they started to, in that case, throw stones. But this, by comparison, is even more direct and certainly more prolonged than in sale. She also stated in her declaration that about 30 minutes later, after she had arrived home, she learned from news reports that the area that she had just departed was the site of burned cars and that ethnic Chinese persons had been robbed and hurt there. Second, Ms. Natan testified that on May 14, 1998, two full truckloads of native Indonesians tried to attack her predominantly ethnic Chinese neighborhood in Jakarta, but that the neighborhood watch team had thwarted them. She testified that she learned that women, mostly ethnic Chinese, had been raped. She testified that after these incidents, she remained at home for two weeks because she feared for her safety. Third, that would apply to many, many people, nothing specific about her. She was not singled out and targeted. I take it, if we follow your logic, that all the Christian Chinese folks who were in that vicinity or whose cars had been attacked would qualify your theory here. Well, Your Honor, on this particular incident, that's true. But it also is part of the case because one has to look at the conditions at that time. It is specific to her neighborhood, and her neighborhood, as she testified, was about 85% Chinese. Well, don't you need more than that, though? Yes, and we have more. Third, Petitioner testified and stated in her declaration that her car had been vandalized many times over the years because of her Chinese ethnicity. She testified in February 1999, two native Indonesians in their 20s, while on a motorcycle in Jakarta, stopped her car while she was at a stoplight. One of them banged her car very hard on the hood and yelled, Chinese. Simply put, contrary to Ms. LeLong's personal facts, tangible evidence of discrimination, harassment, and imminent threats of violence exists in Ms. Natan's case, just as it existed in Ms. Sayle's case, which triggers the application of disfavored group analysis. Well, under the circumstances, because Sayle was decided after this case was heard by the immigration judge, as was LeLong, both all the LeLong cases. So Sayle is about lessened burden of proof to a great degree. Wouldn't the appropriate remedy in this case be, if we credit what you say about Sayle, to remand to the BIA and IJ for reconsideration in light of Sayle so that the BIA or the IJ can reassess the facts in light of Sayle and see if there's sufficient proof? Judge Thomas, we believe that would be an appropriate course. I mean, if otherwise, I think we would be in a position, if we're looking at Sayle, of saying making some evidentiary decisions on appeal, right? That's true, because the IJ ruled in this case on October 3, 2001, and the BIA's decision was on April 19, 2004. Sayle was decided on October 14, 2004. Of course, both sides briefed Sayle and LeLong, of course, in the supplemental briefing, but we believe that would be an appropriate course. Do you want to save some time for rebuttal? Yes, Your Honor. Okay. Thank you. Good morning. May it please the Court. My name is Dallin Riley Holyoak, a trial attorney with the U.S. Department of Justice, and I represent the Attorney General of the United States, respondent in this matter. General undifferentiated claim of the type brought by Ms. Natan does not render an alien eligible for asylum. So how do you deal with Sayle? Sayle in this case is distinguishable from Ms. Natan's claims. First off, as I'm certain the panel is aware, Sayle established the Indonesians of Chinese descent are a disfavored group, but that was at least in the year 2000. And Ms. Sayle was an ethnic Chinese woman from Indonesia who qualified for asylum because she was a member of a disfavored group and had suffered direct past threats and acts of violence. While it's arguable that this Court's in-bank decision in LeLong overruled Sayle, resolving that dispute is unnecessary to this petition for review. I don't think we reserve that issue in LeLong. To a certain extent, this Court distinguished Sayle and LeLong, which, if this panel decides, made that case distinct. LeLong was a pure case of well-founded fear. There was no tender of past persecution that was conceded. It was a case that was argued on pattern and practice, and that was the way it was decided. She didn't have any past persecution. She argued that her family members had been threatened and her friends had been threatened, but she didn't have anything. So it was a pure case of well-founded fear as opposed to past persecution giving a presumption of well-founded fear. Well, Your Honor, with due respect. They've argued past persecution here, so it's slightly different. There are some individualized risks, which we may or may not, the significance of which is doubtful. But my question is, in light of all this case law development, since this particular case was heard by the IJ and BIA, why wouldn't it be appropriate to remand and have the IJ and BIA weigh all of these factors in the first instance? Well, Your Honor, because the agency made the correct decision in this case, and this case is also distinguishable from Sale. In Sale, there was a clear individualized risk. The individuals had come to her boarding house and shouted her name. Later on, individuals who Ms. Sale knew had actually accosted her. In this case, Ms. Natan's claim, the claims that she experienced in the past weren't directed at her. There was no indication that the individuals during the Jakarta riots who surrounded her car and banged on her car actually knew who she was. There was no indication that they would come after her specifically later. In fact, her later claims that there was individuals at a stoplight who banged on her car seemed like a random instance of discrimination. Now, if you look at this case as compared to Sale, it's clearly distinguishable because in Sale there was that clear individualized threat. Also, this case is based on country reports that are 2002. And if you look at this case as compared to Sale, the contradictions in Indonesia had changed. In fact, this court recognized in Lolong that country conditions had changed. Now, if this panel decides to remand this case back to the board, that wouldn't be in Ms. Natan's favor because at that point, DHS could enter the current country reports, which continue to show the situation is improving in Indonesia, which further undermines the claim. You mean it would be better for us to deny relief here rather than remand it so that she has a probability of denying relief? I think she might take a different position on that, if you're... Well, that's fine, Your Honor, but to some extent, Ms. Natan has been allowed to remain in the United States since 1999 without actually having a viable claim of asylum. She explained two instances that would even remotely possibly be some sort of risk, but they didn't actually show an individualized risk. And that individualized risk was very important. And this court, when it issued its decision in Lolong, made that very clear when it distinguished Sale, saying that individualized risk of some extent is necessary if you want to get to the lower burden that's required for asylum. Well, as you might imagine, we have hundreds and hundreds of cases out of Indonesia raising similar issues of different types of evidentiary proof on individualized risk. Some are much like this, some are a little closer to Sale, some are more. I mean, it's a large issue for us. And at least in my view, it might be better for the BIA to sort it out with how they viewed the significance of the evidentiary burdens and how it shook out an individual case in the first instance. Well, regardless, she didn't even meet the standard in Sale. So even if the board was to examine this case in terms of Sale, she wouldn't have met that burden either. So even based on the case law that was established when this case came before the board, this case didn't meet an asylum burden at that point. She didn't prove persecution. She didn't prove that she had experiences that rose to the level of persecution. I mean, in 1998, Jakarta had a specific difficulty that affected many people, not just ethnic Chinese Indonesians. I mean, it was difficult for many people in Jakarta at the time. And she didn't prove that she had an experience in Jakarta that was any different than any other individuals at Jakarta at that time. And also, on top of that, because this court made so clear in Sale that you have to have some kind of particularized risk, she never established that particularized risk, that kind of direct targeting to her. So it would be harmless at that point whether or not the board, if the board would actually look at this decision or look at this case anew, it wouldn't change the outcome because she hadn't even met that burden. It would still deny asylum relief. Turning now to this court's decision in Lolong, which the government believes directly applies to this case. While this court didn't specifically overrule Sale, it pointed out important distinctions. That there first of all is a long history of ethnic and religious strife in Indonesia. But even by the time this court made its decision in Lolong, it recognized that the situation of ethnic Chinese and Christian minorities in Indonesia had vastly improved, removing the presumption that there was a pattern or practice of persecution of ethnic Chinese Christians that continues in Indonesia. A new president has been democratically elected. The president of Indonesia has also taken concrete steps to suppress ethnic violence and encourage reconciliation. Mr. Tan must prove something more than her status as a female member of Indonesia's Chinese ethnic Christian community. She must give credible, specific, and direct evidence of her individual risk of persecution, which she has failed to do. As I see the panel has no further questions, I would like to conclude with the court's permission. The agency properly denied Mr. Tan's applications for asylum and withholding of removal because she simply failed to marshal specific, sufficient evidence to meet her burden of proof. She did not demonstrate a well-founded fear of persecution due to an individualized threat bolstered by membership in a disfavored group, in accordance with this court's decision in Sale. Nor did she adequately distinguish her case from Lolong, which found there is no clear pattern or practice of persecution of ethnic Chinese Christian women in Indonesia. Most importantly, the standard of review must be observed in this case, as Mr. Tan's postulations and inaccurate comparisons simply failed to compel a result, contrary to that of the agency. Therefore, this petition for review must be denied. I would just point out again, Your Honors, that there was a mix of evidence in Sale. At page 928 of Sale, the court observed, and credited as part of the evidence in this case, that Sale was forced to flee after an encounter with angry mobs in May 1998. These people didn't know who she was, but they went after her. Why? Because, hey, there's one Chinese woman over there. Well, that's what happens in 927, Council of Sale. One night, a group stormed the boarding house shouting Sale's name. That's right, Judge Bidey. We did have individualized evidence there. Yes, we did, Judge Bidey. I'm just pointing out, though, that there's also evidence of general harm, and that asylum law also talks about offensive characteristics. That's in the Magarabi case. So you can have a mix of evidence and still get disfavored group analysis. Ms. Natan's family still lives in the same neighborhood where she lives, is that right? Well, as of 2001, the record shows that, but I don't know that that's the case today. Okay, but that's the only evidence that we have in the record. If you are not going to update it, then you can't contradict that that is the only evidence. I think it will be on the record, and in fact, Judge Bidey, I don't know. Do we have any evidence that anybody would be looking for her or waiting for her if she went back to Indonesia? Well, her car was vandalized repeatedly, so there's nothing specific in the record. Did you report the incidents to the police? I note that in Sale, she did go to the police with her complaints. And the police told her, don't do it, or don't file a report, because there will be retaliation. And I think that's the reason why most people don't go to the police, because they fear retaliation, or the police are mostly Native Indonesians and there's no trust at all, because there's official discrimination in that country. But that would sweep with a wide net, though. Just tell me if I'm correct here in my understanding of the facts. Her brother lives in her home in Jakarta. That's as much as we know right now, as well as her other siblings, and they have never reported any persecution. Is that correct? According to the record, as of October 3, 2001, Judge Block, that is correct. And she has a high position. She's a manager for Toshiba in Indonesia, and she was coming and going back and forth from Indonesia to the U.S. and many other places. I mean, doesn't that really weigh against any sense of a particularized threat against her? Well, she resigned her job to come to this country, and she left within ten months of the riots. So it shows that she's very serious about resettling here. She gave up a very good job. What is the law on – she traveled freely out of Indonesia, and she traveled to other countries where she might have been able to ask for asylum. And what inferences, if any, are we entitled to draw from that? Judge Bybee, one can look at that as a potential adverse factor. However, in this decision, Judge Tway did not balance the factors at all, so he did not find it to be an adverse factor. In fact, the government's attorney in this case said this is a very close case in the closing argument of this case. But you waited an awful long time to seek asylum, didn't you? No, Your Honor. She came in around ten months after the riots, and I don't have the exact date of the filing, but it was within one year, which is timing under the law. One year of her last entry. Her last entry was on March 30, 1999. But she had been here before, though. I believe she may have traveled here before. I don't have that right in front of me at the moment, Judge Block. Any further questions?
judges: Thomas, Bybee, Block